```
1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
2

3      ------------------------------------------------------------
                                      )
       Boost Oxygen, LLC,             )   File No. 17-CV-5004
4                                     )            (PJS/SER)
              Plaintiff,              )
5                                     )
       v.                             )   Minneapolis, Minnesota
6                                     )   May 8, 2019
       Oxygen Plus, Inc., a Minnesota )   8:30 a.m.
7      corporation,                   )
                                      )
8             Defendant.              )
       ------------------------------------------------------------
9

10            BEFORE THE HONORABLE PATRICK J. SCHILTZ
                UNITED STATES DISTRICT COURT JUDGE
                        (MOTION HEARING)
11

12     APPEARANCES
        For the Plaintiff:        HOFFMAN & BARON, LLP
                                  ROBERT NEUNER, ESQ.
13                                6 Campus Drive
                                  Parsippany, New Jersey 07054
14
                                  CIRESI CONLIN, LLP
15                                ESTHER AGBAJE, ESQ.
                                  BARRY LANDY, ESQ.
16                                225 S. 6th St., #4600
                                  Minneapolis, Minnesota 55402
17
        For the Defendant:        GRAY, PLANT, MOOTY
18                                LOREN HANSEN, ESQ.
                                  80 S. 8th St., #500
19                                Minneapolis, Minnesota 55402

20     Court Reporter:            DEBRA BEAUVAIS, RPR-CRR
                                  300 S. 4th St., #1005
21                                Minneapolis, Minnesota 55415

22

23          Proceedings recorded by mechanical stenography;
       transcript produced by computer.
24

25
```

1                    **P R O C E E D I N G S**

2                         **IN OPEN COURT**

3              THE LAW CLERK:  All rise.  United States District

4    Court for the District of Minnesota is now in session, the

5    Honorable Patrick J. Schiltz presiding.

6              THE COURT:  Good morning.  Please be seated.

7              We are here this morning on the case of Boost

8    Oxygen, LLC v. Oxygen Plus, Incorporated.  The case is Civil

9    No. 17-5004.

10             If I could have the attorneys make their

11   appearances, please, beginning over here (indicating).

12             MR. NEUNER:  Robert Neuner, N-E-U-N-E-R, of

13   Hoffmann & Baron located in New York.  May it please the

14   Court.

15             THE COURT:  Good morning.

16             MS. AGBAJE:  Esther Agbaje with Ciresi Conlin as

17   local counsel.

18             THE COURT:  Good morning.

19             MR. LANDY:  And Barry Landy, also with Ciresi

20   Conlin.

21             THE COURT:  And good morning to you.

22             MR. HANSEN:  Good morning, Your Honor.  Loren

23   Hansen of the Gray Plant Mooty firm.  And with me today are

24   my clients, Christine Warren and Lauren Carlstrom.

25             THE COURT:  Good morning to all of you.

1           Mr. Neuner, is that how you pronounce it?

2           MR. NEUNER:  Yes, Your Honor.

3           THE COURT:  Mr. Neuner, it's your motion so let me

4     have you at the podium if I could, please.

5           MR. NEUNER:  May it please the Court.  I'd also

6     like to introduce, Your Honor, the president and CEO, and

7     who happens to be my son, Rob Neuner, right here

8     (indicating).

9           THE COURT:  Okay.

10          MR. NEUNER:  Your Honor, this is a case that began

11    and right now it's ending or near its end as a case of

12    unfair competition.  This Court has entered and the parties

13    have agreed to a settlement and consent judgment pursuant to

14    which the validity of the Boost patent, the design patent

15    covering -- and I apologize for not having the cans with me;

16    I couldn't get them on the plane -- but, anyway, covering

17    the mask --

18          THE COURT:  The mask, right.

19          MR. NEUNER:  -- the canister.  The validity has

20    been acknowledged, the infringement by Oxygen Plus has been

21    acknowledged, and an injunction has been acknowledged.

22          Now, the parties reached an agreement which was

23    eminently fair to Oxygen Plus, eminently fair.  Under the

24    settlement and consent judgment, Oxygen Plus was essentially

25    given 12 months in which to get out of the market for this

1    particular type mask.  The first six months were covered by

2    a payment of 75,000.  The next six months were covered by an

3    increasing scale of payments beginning with 10,000 and

4    ending with 35,000.  Now, the parties anticipated at the

5    time that they'd be out of the market within the six-month

6    period, the 75 would cover it.  It happened that they were

7    not.  And it happened that they were making and selling in

8    the period November -- and I might go backward.  The period

9    of the license, if you will, was from May 15th, 2018 to May

10    15th, 2019.

11          So at the end of the six-month period, after which

12    the -- and the 75,000 had been paid, Oxygen Plus was still

13    in the business of selling this particular mask, the mask

14    that was adjudicated by this Court and agreed to by the

15    parties to be an infringement of the design patent, to be an

16    infringement of the trade dress that Boost Oxygen had in

17    this particular product.

18          And I might add, Your Honor, this is a situation

19    where the mask is a totally innovative development by Boost

20    Oxygen.  It was unlike anything that had preceded it.  The

21    market for oxygen canisters is rife with masks and discharge

22    nozzles of any shape and form.  I mean, you want to be in

23    this business, you can put a nozzle on that is not going to

24    approach anything that looks like the Boost Oxygen patent.

25    And that didn't happen.  All right.  So we have the seventh

1    month, if you will, of continuing sales of the mask that was

2    considered to be an infringement and found to be an

3    infringement.

4          Thereafter, in January of 2019 at a trade show --

5    and, Your Honor, that is part of the Neuner declaration

6    supporting the motion -- where depictions of the infringing

7    mask were shown at this show.  Now, the defendant, Oxygen

8    Plus, argues that, well, maybe that was -- I'm not even sure

9    what they argue, but they certainly say that what was

10   depicted or what was sold and offered for sale at that trade

11   show was not what they had been making before.

12         Well, here you have a situation -- and it's, as I

13   say, appended to the Neuner declaration -- here you have a

14   situation where the exact design of that which was found to

15   be an infringement is shown in a large forum, the exact

16   design.

17         THE COURT:  Well, I saw the big bottle and the

18   pictures, but the settlement agreement, the consent judgment

19   doesn't prevent them from displaying it.  It only triggers

20   royalties if they sell it.

21         MR. NEUNER:  That's correct, Your Honor.

22         THE COURT:  And I didn't see any proof that they

23   sold anything at the Denver trade show.  Sometimes you sell

24   things, sometimes you don't.

25         MR. NEUNER:  That's exactly right.

1          THE COURT:  It's uncontested that during that

2     seventh month -- whatever that is, November to December --

3     that they sold the infringing mask and they owe you money.

4     And their reasons for withholding the check are ridiculous,

5     and you're owed the $10,000.  So there's no question in my

6     mind about that.  After that, though, I mean, they say that

7     they redesigned the mask.  They've given me the invoices.

8     They said they've ordered thousands of these redesigned

9     masks and they're not selling an infringing mask anymore.

10    You say they are selling an infringing mask.  And you had

11    your sister order some via mail and you say, look, here's

12    what they say is the new mask.  Here's the old mask.

13    They're the same.  I don't know how I can do this on the

14    fly.  I mean, it's basically like trying to get me to do a

15    patent-infringement case on the fly.  I don't think I can do

16    it.

17          MR. NEUNER:  I couldn't agree more, Your Honor.

18    And that's, obviously, a concern of ours; namely, whether or

19    not this ought to require, if you will, a separate patent

20    trial.

21          THE COURT:  I have had a lot of patent cases that

22    get settled through license and the license has somebody

23    agree that they will no longer sell an infringing product

24    after a certain date, and then the accusation is made that

25    they are selling an infringing patent, they essentially have

1     a brand-new patent lawsuit.  We may be able to cut corners

2     in the sense that we have an adjudication of the old mask

3     violated the patent, the '250 patent.  And if you can hold

4     up the old mask and new mask and in fact they're identical,

5     that might help us shortcut it, but at this point I don't

6     know what to do except send you folks off to take discovery.

7             I can't tell at any time whether we're talking

8     about the old mask that they're selling -- they are allowed

9     to sell the old mask, the infringing mask, as long as they

10    pay you a royalty; they are allowed to do so, I guess, until

11    next week -- or we're talking about the new mask.  I just

12    can't tell from this, other than I can tell they owe you

13    $10,000, plus interest, for December.  Other than that, I

14    don't know what I can do today on this record.

15            MR. NEUNER:  As well as 30,000 because they

16    acknowledge that what they sold in the period March 15th to

17    April 15th was the design, if you will, covered by the

18    consent judgment.  So that's acknowledged.

19            THE COURT:  March 15th to April 15th of this year?

20            MR. NEUNER:  This year, yes, Your Honor.

21            THE COURT:  When did they acknowledge that?  I

22    just missed that, if they did.

23            MR. NEUNER:  By giving a report on the number of

24    cans sold, and that is in the email of counsel.

25            THE COURT:  Cans sold with the infringing mask on

1    it?

2              MR. NEUNER:  Yes, Your Honor.

3              THE COURT:  Okay.  I'm sorry, I just missed that.

4    I did read through the exhibits, but somehow I just missed

5    that.

6              MR. NEUNER:  And I certainly understand your

7    concern, but -- and it may be that we're going to need some

8    discovery in this case, but Your Honor can make a decision.

9    And there's a *TiVo v. Echostar* case which sort of tells you

10   how to proceed in this kind of a contempt proceeding and

11   that is take the infringing canister, hold it, take the new

12   canister -- and whether or not they have sold it, I mean,

13   that I don't know.  But the Warren declaration illustrates

14   what they say is the new design and, as far as I can see,

15   there is no difference between the new design and the old

16   one.

17             THE COURT:  I don't know.  I don't have the new

18   mask.  I mean, what I would need in front of me is something

19   that is undisputed to be the new mask.  And then I would

20   need something that's undisputed to be the old mask.  And

21   then I'd look at the two.  You say they're going to be

22   identical.  They say they won't be identical.

23             I don't know if you do patent work as part of your

24   --

25             MR. NEUNER:  I do, Your Honor.

1           THE COURT:  Okay.  You know how patents talk.  It

2     doesn't take much to make something non-infringing.  We're

3     talking about design patents here, which is their own

4     species.  So one little curlicue that jogs left instead of

5     right can get you out of a design patent.  You might be

6     right, I just don't have the record in front of me.

7           MR. NEUNER:  Let me make just a couple of points.

8     I think you can, Your Honor, from the depictions in the

9     briefs that make that comparison between what the

10    acknowledged infringing mask looked like and what the Warren

11    declaration says it looks like now.  You can make that

12    comparison.

13          THE COURT:  I suspect that this is all going to

14    turn on the angle at which these masks are photographed.

15    All I've got is -- I mean, I've got photographs of masks,

16    but I've only got them from certain angles and not from

17    other angles.  They're not perfect photographs.

18          If you're right, then they spent a whole bunch of

19    money redesigning a mask to come up with something that was

20    identical to what they already have.  That sort of doesn't

21    make sense.  At the same time, your sister ordered these

22    masks and the pictures in the record, they look pretty

23    similar to me.  But, you know, until I can hold these things

24    in my hand and compare them, I don't think I can do

25    anything.

1    MR. NEUNER:  Yes, Your Honor.  They don't have to

2    be -- again, looking at the *TiVo* case, they don't have to be

3    identical.  The Court can make the judgment as to whether or

4    not, okay, are there differences; and if there are

5    differences, are they significant.

6    THE COURT:  Sure.  I've got to see them to do

7    that.

8    MR. NEUNER:  That's something Your Honor can do.

9    Frankly, the plaintiff in this case doesn't see any

10    significant differences between what they were selling.  And

11    if they are selling -- we're not even sure they are selling

12    because we have not -- we have -- I have asked counsel to

13    supply samples of what they are allegedly selling now and

14    obviously ignored.  I don't know what that tells you.  It's

15    one of the reasons we don't have a copy --

16    THE COURT:  Well, it tells me you need to take

17    discovery on that, as well.  We need a record of what did

18    they sell, when did they sell it, were they selling the old

19    mask or were they selling the new mask.  And then we need to

20    adjudicate whether the new mask does or does not infringe

21    the '250 patent.  We would need a record on this stuff.  I

22    can't do a patent case on the fly.

23    MR. NEUNER:  Okay.

24    THE COURT:  I can't do any cases on the fly, but

25    especially not patent cases.  And design patent cases are

 1    so, you know -- they're so much kind of what the eye sees.

 2              MR. NEUNER:  Right.

 3              THE COURT:  And I see your colleague stuck two of

 4    the things on your -- right behind you.  I see there's two

 5    masks there.  Is one the old mask and one the new mask?  Is

 6    that the idea?

 7              MR. NEUNER:  Yes, Your Honor.  This is the one --

 8              THE COURT:  Can I see them?  Would you mind

 9    bringing them up?  Give them to Chelsea.

10              MR. NEUNER:  There they are.

11              THE COURT:  So which one is the old one?

12              MR. NEUNER:  They're both the same, Your Honor;

13    although, one was ordered in this reporting period and

14    delivered to -- actually, she's my daughter.

15              THE COURT:  Daughter, I'm sorry.  My law clerk

16    said she was your sister, so you can blame her.  I'm going

17    to throw my law clerk under -- the sound you hear is the bus

18    rolling over my law clerk.

19              So these look pretty identical to me just

20    eyeballing them.  Maybe Mr. Hansen can -- maybe they admit

21    this is the old one.  I just don't know.  At least I can

22    see -- is this what they actually weigh or are these empty

23    cans?

24              MR. NEUNER:  That's what they weigh.

25              THE COURT:  Because they just have air in them.

1              All right.  Maybe it would be best if I -- let me

2      talk to Mr. Hansen first, and then I'll have you back up,

3      Mr. Neuner, if there's more you want to say.  Okay?

4              MR. NEUNER:  Yes, Your Honor.  Thank you.

5              THE COURT:  Mr. Hansen.

6              MR. HANSEN:  Good morning, Your Honor.

7              THE COURT:  Good morning.

8              So I know you're new to the case and I know the

9      legal work that got us here wasn't yours, so you don't need

10     to point that out to me.

11             MR. HANSEN:  Thank you, Your Honor.

12             THE COURT:  Are you continuing to argue you don't

13     owe the $10,000?

14             MR. HANSEN:  No, Your Honor.

15             THE COURT:  Okay.  This just really was not a good

16     move by your predecessor.

17             MR. HANSEN:  Understood, Your Honor.

18             THE COURT:  I'm sure you know this, I'm sure

19     you've informed your clients of this, even if Boost did

20     commit defamation eight months after I entered my order, you

21     don't get to defy a court order because you anticipate you

22     might win a lawsuit in a couple years.  I'm happy to hear

23     you're not defending it.  Make sure you put that check, plus

24     interest, in the mail to them ASAP, okay, so we can at least

25     take care of through December.

1          So you've looked at the case now.  What's

2     post-December?  What's your position as to post-December?

3          MR. HANSEN:  Right.  So, Your Honor, I think

4     there's a couple things going on here.  You know, really

5     this motion was brought on the $10,000 that was due and

6     owing, and the rest of the motion is premature.  Whether the

7     redesign is an effective redesign, whether there were

8     additional royalties due, that's not properly before this

9     Court.  They were new arguments and new evidence put in the

10    reply brief.  At the time of the briefing, there were

11    amounts that were not due and owing.  But I want to clear up

12    for the Court what has happened even with respect to those

13    two bottles, because those two bottles are identical.

14         So Oxygen Plus was selling the old design through

15    December 15th of 2018, and then it exclusively was selling

16    the new mask until April of '18 -- of '19, excuse me.  And

17    then in that time period they started selling the old mask

18    as well as the new mask, and that would trigger royalty

19    payments.

20         So here is what Oxygen Plus's position is, is we

21    certainly owe the $10 ,000, and I understand that interest

22    will be added to that.  We also made sales in the April

23    reporting period, which we reported to counsel on April 30

24    -- or on -- yeah, on April 30th.

25         THE COURT:  Okay.

1          MR. HANSEN:  And so that amount is $30,000, and

2    that is due.  And then we also admit that we are selling the

3    old mask presently through the end of the license period,

4    which is May 15th.  So that triggers another 35,000.  So I

5    have $75,000 here for plaintiffs.  And I understand that

6    interest ought to be owed to the December time period.

7          THE COURT:  Okay.  So I'll just have you talk to

8    -- I assume the two of you can put your heads together what

9    the interest is.  They're asking for the statutory

10   prejudgment interest rate.  That seems fair to me.  And you

11   can supplement that.  That's good.

12          And then, okay, go ahead.  I'm sorry.

13          MR. HANSEN:  With respect to the remaining issue

14   of the redesign as well as, you know, perhaps their breach

15   of good faith and fair dealing in the license agreement or

16   other torts that Oxygen Plus may raise, I think this is

17   something that, like I say, is not yet ripe, but the parties

18   would greatly benefit by a settlement conference in this

19   matter perhaps with some discovery beforehand or some

20   disclosures beforehand, because the product has been

21   redesigned.

22          THE COURT:  Do you have a redesigned one?

23          MR. HANSEN:  Yes, I do, Your Honor.  And let me

24   briefly explain what has happened here.  This was the

25   patented design (indicating).  And that looks a lot like the

1       patent that's in the record at ECF entry 1-1.  This is the

2       Boost design.

3                THE COURT:  That's the '250 patent?  The Boost

4       design.  Okay.

5                MR. HANSEN:  This (indicating) is the old Oxygen

6       Plus design.

7                THE COURT:  Okay, the infringing design.  Uh-huh.

8                MR. HANSEN:  And this (indicating) is the

9       redesigned Oxygen Plus.

10               THE COURT:  Can you hand the redesigned one to

11      Chelsea.  I'd just like to take a look at it.

12               MR. HANSEN:  Yes, I can, Your Honor.

13               And one of the things that I'd like to clear up is

14      that, you know, I was counsel for *Tivo* at the time of *Tivo*

15      *v. Echostar*, so I'm intimately familiar with that case.

16               THE COURT:  Oh, okay.  I'm sorry, can you hand me

17      up -- so this one (indicating) looks identical to this

18      (indicating).  I thought these were the old ones.

19               MR. HANSEN:  The change is slight, Your Honor.

20      The difference is from an angle, and it's a spherical look

21      on the bottom, as opposed to an angular look.  So the old

22      design has --

23               THE COURT:  Oh, I see.  On the sides underneath

24      the lips?

25               MR. HANSEN:  Correct.  So it's a sphere on the

1    bottom half of the mask; whereas, the old design is more of

2    an angular look.

3              THE COURT:  I see.  I do see the difference now.

4    Yeah.  That looks to me like something you're going to argue

5    about, is what it looks like to me.

6              MR. HANSEN:  Well, and what I want to be clear on

7    is that at least our position is you don't compare the two

8    products.  You compare the patent to the new design.

9              THE COURT:  Yeah.  That's the way the consent

10   judgment is written, is the new design can't infringe on the

11   '250 patent.

12             MR. HANSEN:  Right.  So, Your Honor, I mean, I

13   wasn't around for a lot of this, and I know that Oxygen Plus

14   has admitted infringement and validity of the patent.  I

15   suspect those are issues that would be raised in a new suit

16   on the new design.  But the important thing is there was a

17   redesign, and the redesign is exactly according to Exhibit B

18   of the settlement agreement and consent judgment, which was

19   the allowed redesign.  It's the spherical shape.

20             THE COURT:  Well, that's not exactly how the

21   consent judgment is written.  I know you've read it.  The

22   consent judgment says that your new product can't infringe

23   the '250 patent period.  That's the commitment.  Then

24   there's this sort of musing about the lines and, you know,

25   and the prior art and further iterations will draw us even

1     closer to the prior art.

2              MR. HANSEN:  Right.

3              THE COURT:  So the actual commitment and the

4     consent judgment is you can't infringe the '250 patent.

5              MR. HANSEN:  Yes, Your Honor.

6              THE COURT:  I mean, this is exactly why you can't

7     do patent cases on the fly.  I don't even know if I've got a

8     copy of the '250 patent, but I would have to read it and see

9     if this infringes or not.

10             Then we have the further complication that your

11    client stipulated that the patent is valid and they

12    stipulated that the old design did infringe it.

13             I mean, it looks to me like there's a -- so

14    lawyers should solve problems, not create problems.  This

15    has the potential of spinning out of control and creating

16    hundreds, if not more, hundreds of thousands of dollars of

17    patent lawyer time.  And because we're in a contempt

18    proceeding essentially, your clients could be theoretically

19    responsible for both sides' lawyers.  If there's anything

20    more expensive than paying one side in a patent case, it's

21    paying both sides in a patent case.

22             So I think you folks getting together and seeing

23    if you can settle this is an excellent idea.  I don't have

24    any idea how big these companies are or what kind of revenue

25    they have, but my guess is these are not companies that want

1    to take on million dollar patent litigation, which is what

2    you're looking at.

3            So at this point I don't know what to say to you

4    except you agree you owe the money and you even owe them

5    more money than I thought.  You've paid the money.  You're

6    going to pay the interest as soon as you can.  I can only

7    leave you to your own devices to take discovery.  I think

8    you need to get together.

9            Who is the magistrate judge in this case?

10           MR. HANSEN:  Judge Rau, Your Honor.

11           THE COURT:  So I don't know how quickly -- he has

12   been dealing with some health problems.  I don't know how

13   quickly he's going to be able to get you in, but there's no

14   reason you can't put your heads together without him.  And

15   I'll contact him after the hearing today and see if he can

16   get you in.  But you need to do some combination of

17   settlement conference and discovery.  And, hopefully, you

18   can find a way to resolve this without us having a brand-new

19   patent case blossom out of the mist of this.  Okay?

20           MR. HANSEN:  Understood, Your Honor.

21           THE COURT:  Okay.  So I know this isn't you, I

22   know this was your predecessor, but this criminal defamation

23   stuff is really dumb.

24           MR. HANSEN:  Understood.

25           THE COURT:  I hope not only understood, but I hope

1   agree.

2              MR. HANSEN:  Oh, and I agree.

3              THE COURT:  There hasn't been a criminal

4   defamation case in Minnesota that has been successful in a

5   century.  And, you know, I wrote a list of all the problems

6   with it.  I got to six problems, and I won't go through them

7   with you.  This is just really dumb.

8              So let's focus on getting the thing back on.  You

9   had a settlement.  The settlement looked pretty fair.  I

10  imagine there must be a million ways to design a mask that

11  doesn't infringe the '250 patent; find one.  Maybe this is

12  one.  I'm not stating a position.  This is something that

13  you guys should be able to resolve without both sets of

14  clients pouring tons more money into this case.  Okay?

15             MR. HANSEN:  Thank you, Your Honor.

16             THE COURT:  All right.  Thank you, Mr. Hansen.

17  I'm glad you're onboard.

18             Mr. Neuner, is there anything more you want to say

19  at this point?

20             MR. NEUNER:  Just two points, Your Honor, and Your

21  Honor mentioned it, so I'm not adding anything to the

22  conversation, unfortunately.  But the consent judgment does

23  say that here's a design that you begin with and then you

24  change it to get closer to the prior art and away from --

25             THE COURT:  Yeah.  I didn't read the consent

1    judgment to say that if you design something that meets this

2    drawing, it will not infringe the '250 patent.

3              The commitment there is the new design won't

4    infringe the '250 patent.  It refers to this design.  It

5    kind of says -- I can't remember the exact language -- we'll

6    do something along these lines and we'll continue to get it

7    closer to the prior art.  But that thing, it's one side-view

8    of a -- you couldn't design a mask based on that drawing

9    anyway.

10             MR. NEUNER:  You're right, Your Honor.

11             THE COURT:  I agree.  Ultimately the question will

12   be whether this infringes the '250 design patent.

13             Have you seen this (indicating), this new mask?

14             MR. NEUNER:  I have not, Your Honor.

15             THE COURT:  Well, you'll have a chance to see it,

16   compare it to your patent.  Apparently, the difference they

17   are going to argue is the under-the-lip slopes.  I don't

18   take a position on that at all.

19             MR. NEUNER:  And you're right in terms of

20   certainly my client wants to avoid the expenditure of

21   attorney's fees as, obviously, the defendant does, but in

22   many respects, time is of the essence for my client.  It's a

23   situation where they compete in the marketplace.  People see

24   the two designs.  One design is selling for a lower price

25   than the other.  What are they going to buy when they look

1   at two canisters and both are the same?  If we can -- and I

2   see where we're going with this -- and if we do schedule a

3   settlement conference, I'd like the opportunity if we

4   could -- and I know your schedule is very, very tight -- get

5   an early trial date.  If we're going to have to retry this

6   case, that's fine.  But, as I say, for my client time is

7   important.

8            THE COURT:  I get it, but an early trial date in

9   patent cases is really hard to do.  You're going to have to

10  take discovery.  We may have to have a *Markman*.  I don't

11  think I've ever had a *Markman* in a design patent case.

12           MR. NEUNER:  I don't know why you'd have to.  It

13  is what it is.

14           THE COURT:  And right now, as I sit here today, I

15  am, like most of the judges of this court, already scheduled

16  four months out.  So even if I gave you the next date I have

17  available, you'd still be three or four months out for this.

18           This is something where really reasonable lawyers

19  should be able to get together.  You had a settlement.  It

20  was on track.  There was some unfortunate lawyering on

21  behalf of Oxygen Plus.  I mean, emailing you a copy of the

22  criminal defamation statute is just stupid, and that got

23  things off track.  You told the prior lawyer that this is

24  irrelevant.  The advice you gave him was right.  I wish he

25  had taken your advice at the time.  But Mr. Hansen is in the

1    case now.  I'd ask you to work with him and see if you can

2    get this thing back on track before people spend a ton of

3    money they don't need to spend.

4             MR. NEUNER:  Yes, Your Honor.  And I thank you

5    very much.

6             THE COURT:  So I think what I'm going to do is

7    just deny the motion as moot, given that they've paid you

8    the 75 and committed to paying you the interest, because I

9    don't know what I would say at this point.

10            I'm going to call Judge Rau.  I'm going to ask him

11   to get you in as soon as he can.  I don't know when that

12   will be.  In the meantime, I would certainly urge the two

13   attorneys to talk and see how much you can get resolved and

14   see if you can get this back on track.  Okay?  So that's the

15   way we'll proceed.

16            Thank you for your help with the case.

17            MR. NEUNER:  Thank you very much, Your Honor.

18            THE LAW CLERK:  All rise.

19            (Court adjourned at 8:56 a.m.)

20                           *      *      *

21            I, Debra Beauvais, certify that the foregoing is a

22   correct transcript from the record of proceedings in the

23   above-entitled matter.

24            Certified by:   *s/Debra Beauvais*
                             Debra Beauvais, RPR-CRR
25